OPINION OF THE COURT
Lewis L. Douglass, J.
This decision is in response to the prosecutor’s pretrial request to be permitted to use the Grand Jury testimony of two witnesses as evidence-in-chief, because the prosecutor claims these witnesses have been threatened by associates of the defendant who, along with the defendant, are organized crime members.
The defendant Colon, who is not involved in the issues associated with the threats, in the event the court permits testimony which would allow the jury to learn of the threats and the possible link between the defendant Paradiso and organized crime, seeks a severance.
FACTUAL BACKGROUND
On February 7, 1983, Phillip Paradiso was arrested and charged with the gunpoint robbery of a grocery store.
Following the arrest of Paradiso, the police arrested James Colon, who was then a 16-year-old high school *1085 student working part time in the store, and charged him with having assisted in arranging the robbery by Paradiso, whom he refers to as his uncle.
The teen-age son[1] of the owner, who was working in the store at the time of the robbery, identified the defendant Paradiso as the robber; and the wife identified him before the Grand Jury.
Sometime subsequent to the Grand Jury testimony, the family became uncooperative and told representatives of the District Attorney’s office that they could not identify the robber. When pressed for an explanation of this change of heart, they told various detectives and Assistant District Attorneys that they had been threatened.
It is against this background that the District Attorney moves for a ruling which would permit him to introduce the Grand Jury testimony as evidence-in-chief, since the District Attorney expects that the witnesses will not identify the defendants as the perpetrators, and without the Grand Jury testimony the prosecutor will be unable to establish a prima facie case since there are no other witnesses to the robbery.
This court then held a hearing pursuant to the guidelines laid down in Matter of Holtzman v Hellenbrand (92 AD2d 405) to determine whether the defendant’s misconduct is involved in causing the witness to repudiate their Grand Jury testimony.
Defendant Paradiso argues that Holtzman (supra), is not controlling in this case since in Holtzman the witness was unwilling to testify; whereas here, the witness will testify, but that testimony is expected to repudiate the Grand Jury testimony. In such circumstances, the defendant argues, the issue is governed by CPL 60.35 (subd 2) which provides in part: “Evidence [of] a prior contradictory statement * * * may be received only for the purpose of impeaching the credibility of [a] witness * * * and does not constitute evidence in chief.”
*1086 CPL 60.35 is the statutory codification of the common-law rule which barred prior contradictory statements because such statements are hearsay in that they were made out of court and were not subject to cross-examination. Holtzman (supra) however, is the logical extension of a long series of cases which created an additional exception to the hearsay rule and allowed such statements into evidence where the witness’ present unavailability or repudiation of his Grand Jury testimony is caused by the defendant’s misconduct (United States v Mastrangelo, 693 F2d 269).
The fact that in Holtzman and Mastrangelo (supra) the witnesses were unavailable, refusing to testify in Holtzman and murdered in Mastrangelo, whereas here the witnesses are available but are expected to repudiate their Grand Jury testimony, is of no consequence and does not distinguish this matter from either of those cases. Where the witness’ unavailability or his refusal to testify or his repudiation of Grand Jury testimony is caused by the defendant’s misconduct, the rule is the same. No justice system can permit misconduct by a defendant from preventing reliable evidence from being put before a jury.
The “due process” clause of the Constitution and an inherent sense of fairness would compel a different conclusion if the exception to the hearsay rule would create a fundamental unfairness by allowing unreliable evidence to go to a jury. Here, we do not run the risk of submitting unreliable evidence to the jury. In this case the jury will have the opportunity to hear both statements, that is the Grand Jury testimony, and also hear the witness’ courtroom testimony. The jury will then be in a position to decide when the witness was telling the truth. Virtually every recognized legal scholar on evidence agrees that the rule which restricts the use of prior inconsistent statements to credibility in actual application prevents juries from hearing that which may be the most reliable evidence, particularly, as here, where the maker of both statements is present and available for cross-examination.
Professor McCormick identified the inherent trustworthiness of the prior statement, and citing Wigmore and other eminent scholars on evidence made the following comment:
*1087 “The argument seems persuasive that if the previous statement and the circumstances surrounding its making are sufficiently probative to empower the jury to disbelieve the story of the witness on the stand, they should be sufficient to warrant the jury in believing the statement itself.
“These arguments in favor of using prior statements as substantive evidence seem weighty enough either to cause the courts to bring forward answering arguments supporting the orthodox rule, or to abandon it. The reasons have not lacked for respectable sponsors since they have been voiced most strongly by the greatest judge of our day and by the greatest legal writer in our history”. (25 Tex L Rev 582-583.)
This is not to suggest that the State Legislature may not create various procedural protections for criminal defendants in an effort to insure fair trials. Or, that the Legislature may not disagree with those who advocate rejection of the rule in CPL 60.35. And where a defendant is free from wrongdoing the court must insure that the defendant is accorded all rights created by the Legislature. But where, as here, the defendant’s conduct exploits the protections created by the Legislature, to the detriment of the truth-finding process, the defendant by that misconduct waives the procedural safeguard.
Defendant next argues that before the Grand Jury testimony may be introduced it must be established by “clear and convincing evidence” (Matter of Holtzman v Hellenbrand, supra, p 415) that the defendant was responsible for the threats. It is true that no witness testified that the threats were made by Paradise, nor did any witness testify that those making the threats specifically stated that they were doing so at Paradise’s request. But juries throughout this State are routinely told to use their “common sense” and not to apply “mystical or artificial tests” in deciding the truth. And this court likewise, in determining whether Paradise is a participant in the threats by his associates in an organized crime structure, must also evaluate the question of Paradise’s participation on a commonsense basis. In making this evaluation, the test is whether the defendant is involved through “knowledge, complicity, planning, or *1088 in any other way” in the wrongful conduct which makes the witness afraid to testify (United States v Mastrangelo, supra, p 273). It therefore seems clear that if it can be shown that the defendant is associated with an organized crime structure and persons of the same crime family, of which the defendant is a member, make threats, the defendant is involved in that misconduct. To hold otherwise would suggest that some members of a crime structure could threaten witnesses and a defendant on trial would receive the benefit of that wrongful conduct simply because there is no direct evidence of the defendant’s involvement in the making of these specific threats.
In assessing the relationship between Paradiso and those making threats, both Paradiso and the husband’s background and their involvement with organized crime is significant.
The People called Richard Rudolph, an FBI agent who investigates organized crime. He described the structure of crime families and indicated that the base of operation of five of the major crime families is in the section of Brooklyn where the husband’s store is located. He further testified that two of Phillip Paradise’s brothers were in custody on Federal charges; that Michael Paradiso was a “soldier” in the Gambino crime family and that Phillip Paradiso, the defendant, had been the payee on checks issued by an extortion victim who had been threatened with a blow torch by one of Phillip’s brothers, and Phillip eventually pleaded guilty to that offense.
The People also introduced the “Valachi”[2] testimony before a Senate Committee investigating organized crime and testimony before a later Senate Committee[3] identifying the husband as a “fence” for organized crime in support of the now-accepted fact that crime families are bona fide organizations with recognized modus operandi.
It is the People’s argument that Paradiso unknowingly robbed a store operated by a person who is either currently, or at one time was connected with the Gambino crime *1089 family, and that the threats were made when it was discovered that both the robber and the victim had linkages to that crime family. The defendant argues, without conceding these connections, that the reluctance to testify is not the result of threats but rather the wish of the husband, now discovering the mutual connections to the Gambino “family,” to resolve the matter out of court. But the testimony of detectives and an Assistant District Attorney, which this court finds believable, clearly shows that the crime victims are now recanting their testimony, not out of loyalty to the Gambino family, but because of fear.
One detective testified that the husband told him that “the boys from the local area told him he was doing the wrong thing and that he should back off before something happens.” He also told the detective that he “was afraid for himself and his family.” The detective further testified that the husband was visibly shaken and said, “These men would kill.” The Assistant District Attorney testified that the wife was distraught, wanted to continue with the prosecution, but was subject to pressure, and it was clear that she was frightened about her teen-age son’s safety.
From the testimony it is fair to conclude that organized crime families exist in the area of Brooklyn where the holdup occurred; that Phillip Paradiso is associated with one of those crime families; that others associated with the crime families in that area of Brooklyn have threatened the People’s key witnesses for the purpose of benefiting the defendant; and the defendant, by reason of his continuing association with that organized crime structure, is associated with and benefits from those threats, and thus has waived those rights created by CPL 60.35.
THE EFFECT OF THE IDENTIFICATION BY USE OF A PHOTOGRAPH
The defendant further argues that in this case, even if the Grand Jury testimony is allowed into evidence-in-chief, the People will still not have established a prima facie case since before the Grand Jury the witness identified the defendant’s picture and the witness will not make a courtroom identification. Concededly, the general rule prohibits reference to a previous photo identification, or to put it another way, no person may be convicted without a *1090 face-to-face identification (People v Lindsay, 42 NY2d 9; People v Griffin, 29 NY2d 91). But our courts have always held that where a defendant seeks to take unfair advantage of that rule, he “opens the door” to the introduction of the photograph identification (People v Caseria, 19 NY2d 18; People v Barnes, 93 AD2d 864). Here, this defendant, by his misconduct, has “opened the door” and even without that concept, it follows that by his misconduct the defendant has waived this protection just as he has waived his CPL 60.35 rights. And, again, since courts must always be concerned about inherent fairness, this jury will be permitted to decide whether the picture which the witness identified before the Grand Jury is in fact the picture of the defendant, and the jury will determine whether the witness was telling the truth when he identified the person in the picture as the person who committed the robbery.
THE WADE ISSUE
The defendant also challenges the propriety of the wife’s identification of the photograph before the Grand Jury which was selected from an array. The wife now testifies that the police told her which photograph to identify. The wife is obviously and understandably frightened. The repudiation of the photo identification is consistent with her interest in not testifying against the defendant. That fact, coupled with the inconsistencies in her testimony about the photo identification, her demeanor, her fear, her concern about her son’s safety all render her testimony on this point unworthy of belief. The Wade objection is denied.
colon’s motion to sever
Under all the circumstances, and in the interests of justice, Colon’s motion for a severance is granted. He is 16 years old, never before involved with the criminal justice system, wholly unconnected with the threats. It is also of particular significance that the wife continues to implicate him and throughout her testimony offers gratuitous comments obviously designed to strengthen the case against Colon. Moreover, since Colon was not involved in the threats, he has waived no rights, and is thus entitled to a separate trial where he can be accorded all the rights available to criminal trial defendants.

. Since the court recognizes that this family, already crime victims, may wish to minimize disclosure on the public record of the husband’s past ties with organized crime, and since there is no current evidence of illegal activities on his part, this decision will omit use of crime victims’ names in the hope of minimizing embarrassment to them.

. Hearings before Permanent Subcommittee on Investigation of the Committee on. Govt. Operations, 88th Congress, Part I, Sept. 25, 1963.

. Hearings before Permanent Subcommittee on Investigation of the Committee on Govt. Operations, 90th Congress, Part I, June 8, 1971.