[606 NYS2d 656]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICHARD SMITH, Appellant.

First Department, January 20, 1994

APPEARANCES OF COUNSEL

*Miriam J. Hibel* of counsel, New York City *(Philip L. Weinstein,* attorney), for appellant.

*Kathleen E. Fay* of counsel, New York City *(Donald J. Siewert* with her on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

Asch, J.

The issue before us is whether declarations against penal interest of a third party, which tended to exculpate the defendant Smith, should have been admitted into evidence. A necessary prerequisite for determination of such an issue is a familiarity with the underlying facts, and so, we set them forth in substantial detail.

At trial, Claudia Johnson testified that on January 24, 1991,

she and her husband, Kirk Barrett, lived on East 129th Street in Manhattan. At approximately 8:00 P.M., Johnson was walking home along the north side of 129th Street, approaching Fifth Avenue. As the witness crossed the street toward a bodega located on the south side of the street, she heard two men arguing in front of the bodega. She looked over to see defendant (described as a light-skinned black man wearing a green army jacket and hat) arguing with a dark-skinned Jamaican man wearing dreadlocks (later identified as Donald Davis, the victim herein). The defendant was waving his hands and saying "You know what's up. You know, that's my people". Davis spoke at a normal tone and Johnson could not hear what he said. As Johnson neared the two men, Davis began to walk toward Lenox Avenue. Defendant then ran toward the bodega and took off his jacket. Defendant came out of the bodega and followed Davis, calling "Yo, what's up?" Davis turned and walked toward defendant, who shot Davis "in his head" from about eight feet away. Johnson testified Davis fell on his side, facing defendant and when he tried to get up, defendant shot him again, in the upper body, from about seven feet away. Ms. Johnson saw defendant run off toward 130th Street, but she stayed at the scene and talked with her friend Ivory, as well as with others. The witness also testified she talked with "some of my friends that seen it happen, too".

Ms. Johnson testified further that at that point she saw her husband, Kirk Barrett, on the opposite side of the street, being frisked by the police. (He was not arrested.) Although Ms. Johnson was approached by Detective Clark, she did not speak with him on the street. However, she made a statement the next day at the local precinct, and identified defendant, who was number six, in a lineup on January 30, 1991 (six days after the shooting). Johnson had seen the defendant for the past year about three times a week in the neighborhood, mainly at the bodega on the corner of 129th Street and Lenox Avenue which was his "hangout".

Kirk Barrett, who had been arrested three times for assaulting Ms. Johnson, testified that at the time in question, he was looking for his wife in the area of 129th Street near Fifth Avenue. He arrived at the corner at the time defendant was calling out to the victim. He, too, identified defendant in court and in a lineup on January 30, 1991 as the shooter of Mr. Davis, the man with the dreadlocks. Barrett (unlike his wife) had *never* seen defendant before the day of the shooting.

When defendant ran from the scene of the shooting, Barrett followed him towards Fifth Avenue, then toward the projects near 131st Street. He gave up the chase and returned to the scene. He was approached by a police officer and when his wife came over, they went home.

Barrett testified that he spoke to his wife that night about the shooting and they had discussed it as well during the trial both before and after her testimony. As noted he had identified defendant who was number six in the lineup and in court, although he had never previously seen him. He also testified that he did not know Robert Skinner or anyone named "Speedy" or "Speedo". Then, shown defendant's Exhibit A, a photograph of Skinner, defendant's brother, the witness first said that he did not know "the gentleman" depicted in the photograph and had never seen him before, but immediately thereafter, said he *had* seen Skinner before. In fact, the court interjected "You have seen that person before? [referring to the photograph of Skinner]" and then to make the question clear, the court rephrased "Before today have you ever seen that man. Take a good look." Barrett then testified he had seen the man in the photo (Skinner) "in the precinct" on January 30, 1991 (the date of the lineup). During further questioning of the witness regarding defendant's Exhibit A for identification, the witness said that the person in the photo was number 6 in the lineup (which was defendant Smith's number) and that the photo was, indeed, that of "Mr. Smith".

On redirect, Mr. Barrett was again shown defendant's Exhibit A for identification and asked if that was a picture of defendant. The witness first said "Yes, that's the gentleman," then in response to the question "You are trying to tell us that the same picture, the same guy? *[sic]*", said, "No, he has put on some weight". Again, when asked, "The picture I just showed you, now, do you recognize who was in that picture?", and after what the court reporter termed a "Long Pause" said he recognized him. When asked if it was a picture of the defendant, Mr. Barrett once more said "Yeah, this is him." Then, when shown a picture of defendant (People's Exhibit 5 for identification) along with a picture of Skinner (defendant's Exhibit A for identification), the witness said, in response to further repeated (and leading) questioning by the prosecutor, that the pictures were of two different people and that defendant, in People's Exhibit 5, was the shooter, not the person in defendant's Exhibit A (Skinner).

Detective Clark testified that he arrived at the scene shortly

after the shooting, at about 8:30 P.M. He confirmed that he spoke briefly with Ms. Johnson at the scene, but did not get a description of the shooter from her, at that time. The next day, he conducted full interviews with Ms. Johnson and Mr. Barrett. He did not ask her to detail the shooter's features, since she said she was familiar with the shooter. However, in a statement she gave him, which he wrote down "as she spoke them", she did not indicate in the statement that she had seen the perpetrator prior to the night of the shooting. He also confirmed that People's Exhibit 5 for identification was a photograph of defendant taken by the officer upon defendant's arrest and was an accurate representation of defendant's appearance at the time. Detective Clark also identified defendant's Exhibit A for identification as a photograph of Robert Skinner, also known as "Speedy" or "Speedo" (entered into evidence as defendant's Exhibit A). Detective Clark also testified that Ms. Johnson had told him at the scene that she had seen the shooter prior to that date. Although the detective had interviewed people in the bodega, he never recovered a green jacket or a gun.

At the outset of the trial, the defense had advised the court of the defense theory that the slaying was drug related, and that a paper found on the victim, Donald Davis, contained the name of "Speedo", the nickname of Robert Skinner, defendant's brother, who was the person in defendant's Exhibit A. The defense noted that witnesses would testify that Skinner had confessed to killing Davis.

The court, however, sustained objection to defense counsel's attempted questioning of Detective Clark regarding whether Skinner's name and beeper number were found on a paper recovered from the victim and whether or not the police contacted Skinner. An in camera conference was called during which defense counsel made an offer of proof that Skinner (also known as Speedo) was contacted by the police because his name and beeper number were found on the victim and that Skinner implicated defendant (his brother) in this case. The court ruled that whether or not the police contacted Speedo was not relevant at that time but, should defendant offer evidence that Speedo, indeed, had committed the crime, inquiry as to details would be permitted.

Defense counsel then elicited from Detective Clark that he recovered a telephone number from a piece of paper found on the victim; that Speedo was arrested along with defendant on January 30, 1991, but was released the next day and was

never placed in a lineup in connection with this case; and that although he observed "some narcotic material" (which appeared to the officer to be crack cocaine) on the sidewalk in the area where the victim had been shot, the officer recognized no connection between this case and that crack cocaine.

Defense counsel made a renewed offer of proof that, if he did not invoke his Fifth Amendment privilege, Skinner would testify that he shot Davis because Davis had smoked crack he was supposed to sell for Skinner; that Skinner admitted to "a number of people" that he shot the victim herein; that he had pulled a gun on defendant Smith on at least one occasion in the past; that his jealousy of defendant prevented him from confessing to the police; that his name and beeper number led the police to him; and that he was instrumental in the arrest of defendant and received $100 from the police for his assistance in leading them to defendant. Thereafter, Skinner was brought into the courtroom (outside of the jury's presence) and, at first, denied knowing Davis or even being nicknamed "Speedo" or "Speedy". However, after conferring with his attorney, and asked the same questions, he invoked his Fifth Amendment right not to answer any question connected with this case. The court then exercised its discretion in denying defense counsel's request that Skinner be called as a witness for the purpose of invoking his Fifth Amendment privilege *(People v Thomas,* 51 NY2d 466, 473 [wholly improper in most cases to give jurors opportunity to speculate by allowing a party to parade a witness before the jury for the sole purpose of eliciting in open court the witness' refusal to testify]). The court also reserved decision on the defendant's request that Skinner be "displayed" to the jury, so that it could properly evaluate the identification testimony, evidently in light of Barrett's conflicting testimony as to the photograph of Skinner being a picture of defendant.

The court then held a hearing regarding the admissibility, as declarations against penal interest, of Skinner's confessions allegedly made to two other witnesses. At that hearing, Lashawn Davis testified that during the afternoon of January 25, 1991 (the day following the shooting), when she was at her apartment with her child and defendant Smith, the father, Skinner who was also there, told her that he had shot "DD" (apparently referring to Donald Davis). Later, Skinner was "beeped" while he was at her apartment and asked if he could use the phone. Ms. Davis consented to call the number back for him and when she did a police officer answered and asked

to speak with "Speedy" (Skinner's nickname). After talking with the police officer, Skinner told Ms. Davis that the police wanted him to "identify the body" and then left the apartment.

On January 29, 1991, at approximately 11:45 P.M., Cheryl (or Larelle) Walker, defendant, and Skinner, were with Ms. Davis in her apartment and defendant and Skinner went with Ms. Walker outside to get a cab. Defendant did not return and Skinner returned about 3:00 A.M. with police officers who asked to speak with her about defendant. Before they left, Skinner asked the police officers for change of a $100 bill (they did not have it).

Lisa Skinner (the sister of both defendant and Robert Skinner) testified at the hearing that she knew the victim, Donald Davis, from the neighborhood and saw him at the corner of 132nd Street and Fifth Avenue on two occasions in January of 1991. The court refused to allow her hearsay testimony that when Donald Davis saw her, he asked her where Robert Skinner was.

Larelle Walker testified at the hearing that she knew the victim from the neighborhood for 10 to 15 years. She knew Skinner, also known as Speedy, because he lived in her building and often visited his sisters there. She described the area of 129th Street and Fifth Avenue as a hangout for drug dealers and said that she had seen both the victim and Skinner selling drugs, along with others, in front of the bodega at that location during January of 1991. She testified that Donald Davis and Robert Skinner were "working together". In the middle of January 1991, she testified Skinner asked her if he should give a package of crack to the victim, but the court refused to allow her to say if the victim used crack.

On January 24, 1991, at about 8:30 P.M., the witness was sitting outside of her apartment building with others when Skinner came running up to the group and said repeatedly, "I just shot that nigger". Approximately 11:30 that evening, the witness saw Skinner in the hallway outside her apartment and he said "I had to shoot that nigger". At that time Skinner did not say who it was that he had shot. About two days later, the witness again saw Skinner in the hallway and he then said "I had to shoot Donald Davis", and added that he did so "to make an example." She testified, "His words was, 'I can't let nobody do that to me. I have to make a example. I had to

kill the nigger. I had to kill Donald Davis' ' ". On January 29, 1991, between 11:00 P.M. and midnight, the witness was at Lashawn Davis' apartment (the witness is married to Davis' cousin) with Davis, Skinner, and defendant. The two men walked her outside to get a cab and as she entered the cab she looked back and saw that the police had approached Skinner and defendant. Two days later, the witness again saw Skinner in the building hallway and he said "I had to kill Donald Davis because he didn't give me my money". On cross-examination, the witness testified that during the many years she had known Skinner, he had periodically told her that he had committed various crimes, including robberies, rapes, and the last time, 10 years ago, murder. However, she said that Skinner was "crazy". In response to the court's question why the witness believed Skinner was "crazy", the witness responded "by the things he's done. I have been sitting there when he have just robbed a supermarket, okay. And he have came and put the money in my lap or asked me could you hold this."

Patricia Callendar (another of defendant's and Skinner's sisters) testified at the hearing, that, on an unspecified date in late 1989 or early 1990, she was at home with her family, including defendant, when Skinner came by. Defendant and Skinner got into a fight and she saw Skinner holding a gun.

Detective Clark testified at the hearing that he saw what he believed was a vial of crack cocaine at the shooting scene. The parties stipulated that three or four vials of crack were found on the victim (as well as the presence of cocaine in the victim's body), and a piece of paper with a telephone or beeper number and the name "Speedy" or "Speedo". Detective Clark's "understanding" was that another detective called the number on the piece of paper. He acknowledged that defendant and Skinner were arrested at 11:55 P.M. on January 29, 1991. The parties also stipulated that if Lashawn Davis were recalled, she would testify that she has seen Skinner wear a green army jacket, but that Smith never wore or owned one.

The trial court denied defendant's application to admit Skinner's alleged confessions through the testimony of Lashawn Davis and Larelle Walker. The court found that Skinner's status as defendant's older brother rendered the motivation for the alleged statements suspect. It noted that Skinner's motivation to incriminate himself "may be out of his love for his brother, hate for his brother, or whatever else paternal [sic] emotions may exist". The sheer bulk of confessions to Ms.

Walker regarding this case and numerous others, when considered with Ms. Walker's view of Skinner as disturbed or crazy (based upon his boastful confessions and his general conduct observed over a period of years), rendered the alleged confessions even more suspect to the court. It found further that, in the context of the evidence presented at trial, none of the testimony at the hearing provided independent evidence to prove the trustworthiness of the declarations.

Upon the application of defense counsel for even further rulings regarding the admissibility hearing, the parties stipulated that were Lashawn Davis recalled, she would say that to her knowledge defendant did not own, nor wear a green army jacket. However, the court ruled that the witness's proposed testimony that Skinner did wear such a jacket was not relevant because such a jacket was common; and reiterated its ruling that the victim's and/or Skinner's alleged involvement in drug activity was likewise irrelevant to the issues before the jury. When counsel sought to "display" Skinner to the jury to show the similarity of their appearances, the court decided, regardless of whether counsel had technically renewed the motion, "not to permit that procedure to take place" since there was no evidence in the case that would connect Skinner as the perpetrator of the crime.

Defendant then called Ms. Davis as a witness at trial. Lashawn Davis testified that she and defendant lived in the same building complex. Although defendant kept his clothes at his mother's apartment, he spent a lot of time at the witness's apartment. At about 8:00 P.M. on January 24, 1991 (the time of the shooting), she recalled that defendant was with her in her apartment. She specifically recalled the time because the Cosby Show was then on television and she and defendant made love during the show. She testified further that defendant did not own a green army jacket and that she had never seen him wear one. On January 29, 1991, at about 11:50 P.M. the witness was at her apartment with defendant, Skinner, and Larelle (Cheryl) Walker. Defendant and Skinner went outside to get Ms. Walker a cab. At about 3:00 A.M., Ms. Davis received a telephone call from a police officer who asked where her apartment was located. Then Skinner came to her apartment with two police officers, who asked her questions regarding January 24, 1991 (the date of the shooting). Since they had asked these questions, she remembered what had happened on that date concerning defendant.

The final witness called by defendant was Detective Tim-

merman, who testified that he searched defendant's mother's apartment in connection with the investigation of this case approximately three days after the shooting, but recovered no gun or army jacket from that apartment.

■ When the trial court refused to allow the jury to hear the testimony relating to Skinner's confessions to the crime with which defendant Smith was charged, it effectively denied Smith a fair trial. "The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to [Smith's] defense." *(Chambers v Mississippi,* 410 US 284, 302 [name in brackets changed from Chambers to Smith].)

In New York, the Court of Appeals, in 1970, first modernized the scope of declarations against interest to extend their use from declarations against proprietary or pecuniary interest to include declarations against penal interest in *People v Brown* (26 NY2d 88, 91), by noting, "the distinction which would authorize a court to receive proof that a man admitted he never had title to an Elgin watch, but not to receive proof that he had admitted striking Jones over the head with a club, assuming equal relevancy of both statements, does not readily withstand analysis."

Thereafter, in *People v Settles* (46 NY2d 154, 167), the Court of Appeals set forth the factors which would qualify a declaration against penal interest for admission: "To qualify for admission into evidence as a declaration against the maker's penal interest the following elements must be present: first, the declarant must be unavailable as a witness at trial; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability (see *People v Harding,* 37 NY2d 130, 135 [concurring opn]; Richardson, Evidence [10th ed—Prince], § 257; Fisch, New York Evidence [2d ed], § 892)."

Here, Skinner invoked his privilege against self-incrimination when he was called to testify. Thus, he was "unavailable" as a witness at the trial *(People v Settles, supra,* at 167). Second, there can be no serious argument that Skinner was not "aware" that his confessions to the murder of Donald

Davis were "adverse to his penal interest". Third, Skinner, the declarant, confessed to a killing which, he himself, had done, thus showing "competent knowledge of the facts underlying the statement". The trial court found, however, that the fourth prong of the test had not been met, namely, that there were not sufficient supporting circumstances independent of the statements themselves to attest to their trustworthiness and reliability.

However, we find that the credible evidence adduced at the hearing *did* show supporting circumstances independent of Skinner's confessions sufficient to attest to the trustworthiness and reliability of those confessions. The Court of Appeals has declared that: "Only when there is other evidence tending to show that the declarant * * * actually committed a crime, may a declaration against penal interest be said to display the degree of reliability sufficient to overcome the dangers of admitting hearsay evidence" *(People v Settles, supra,* at 169). Here, the testimony of an eyewitness to the crime not only placed the declarant Skinner at the scene of the crime, but, even more corroboratively, the testimony of Kirk Barrett, an eyewitness for the People, identified a photograph of Skinner as one depicting the killer. Barrett also identified the photo as one of defendant Smith (not surprising since they are brothers and apparently similar in appearance). The trial court found Barrett's identification of Skinner to be a "mistake" which was corrected by the witness. However, the testimony was no isolated "slip of the tongue", but a positive and unequivocal identification of Skinner. Although later recanted, under relentless leading questions by the prosecutor on redirect examination, the trial court was wrong to subjectively assess the probative worth of Barrett's testimony and not even consider it as a supporting circumstance independent of Skinner's confessions. "Whether a court believes the statement to be true is irrelevant, and the question of admissibility is to be resolved without regard to the seeming strength or weakness of the People's case" *(supra,* at 170).

While the court deemed Larelle Walker's testimony that Skinner was "crazy" as a showing that Skinner was disturbed and thus apt to confess falsely, upon a perusal of the record, it is obvious that the court interpreted her testimony incorrectly. Ms. Walker did not testify that she did not believe Skinner or thought he was "crazy" for what he said; rather, she testified that she believed Skinner was "crazy" for the antisocial and criminal acts he had engaged in over a long

period of time. She had reason to believe his confessions to be true, judging from his past activity known to her. Thus, she herself knew of his robbery of a supermarket, after which he put the stolen money in her lap, had seen him with a gun, and knew he had been convicted of many crimes. (Skinner's "rap sheet" confirmed her understanding.) Under these conditions, the trial court was not justified in interpreting the declarant's personality as a factor weighing against the admission of the confessions (cf., *People v Shortridge,* 65 NY2d 309, 315; *People v Maerling,* 46 NY2d 289, 299).

■ Besides the identification of Skinner by Barrett as the shooter, another independent circumstance attesting to the trustworthiness and reliability of Skinner's statements is the fact that he made five consistent confessions to two individuals, both Lashawn Davis and Larelle Walker, within a short time after the murders. "The sheer number of independent confessions provided additional corroboration for each" *(Chambers v Mississippi, supra,* at 300). Adding to their reliability were the circumstances under which the confessions were made. The first was made minutes after the crime to his childhood friend Larelle Walker, who was sitting outside her building in the projects, the direction in which Barrett testified the killer of Donald Davis fled. The others were also made within a short time after the crime, both to Walker, continuing Skinner's habitual sharing of his criminal activities with her, throughout their friendship, and with Lashawn Davis, his brother's lover.

Additionally, evidence to which the trial court assigned little, if any, weight, also tended to furnish Skinner's statements with more of the patina of reliability. "Circumstances of seeming indifference may still harmonize the declarant's statement so as to furnish the necessary link. By way of illustration, eyewitness testimony placing [Skinner] at or near the scene of the crime, or proof of his possession of the fruits or instrumentalities used to commit the crime would suffice. Supportive evidence is sufficient if it establishes a *reasonable possibility* that the statement might be true" *(People v Settles, supra,* at 169-170 [name in brackets and emphasis added]). Thus, the shooter was seen by Claudia Johnson, wearing a green army jacket and cap. The defense was foreclosed from showing that Skinner had such clothing. There also was testimony that a search of defendant Smith's mother's apartment failed to reveal such an outfit and other testimony was adduced that Smith never wore such clothing. There was

testimony that Skinner was frequently seen on the very corner where the killing took place with the victim, and a witness, Lisa Skinner, was prepared to testify that the victim specifically sought out Skinner's whereabouts on different occasions. Other evidence tended to show that Skinner and the victim, Donald Davis, sold drugs together on that corner. Further, Skinner had a "beeper" on him, and a search of the victim's body produced Skinner's nickname and beeper number. These details, while perhaps of "seeming indifference" all played a role in "harmoniz[ing]" Skinner's confessions. Thus, Skinner had told Larelle Walker of his plan to give Donald Davis crack to sell, and afterwards told her he had to "make an example" of Davis who "didn't give me my money".

■ Further, the court erred in citing *Settles (supra)* to find that the statements were intended to exonerate defendant, Skinner's brother, when it stated that "the facts in this case would indicate what the Court of Appeals was talking about * * * [t]he motivation for him to make such statements against penal interests that is, indicating that he himself committed the crime may be out of his love for his brother, hate for his brother, or whatever else paternal *[sic]* emotions may exist". It is not clear why Skinner would confess to the crime because he *hated* his brother, and as defense counsel pointed out, the statements sought to be introduced were made before defendant Smith was arrested, and Skinner's antipathy toward his brother was shown by his once pulling a gun on defendant.

Moreover, the court did not fairly evaluate the evidence which the defense offered to show the trustworthiness and reliability of Skinner's confessions. It basically required a showing by the defense that each proffered fact prove the reliability of Skinner's confessions. The People, upon this appeal, support that position by noting the caveat of the Court of Appeals that a declaration against penal interest may be admitted only when competent evidence independent of the declaration is presented to establish that "the declaration was spoken under circumstances which renders it highly probable that it is truthful" *(People v Brensic,* 70 NY2d 9, 15).

However, as pointed out by now Chief Judge Kaye, in *People v Thomas* (68 NY2d 194, 198, *cert denied* 480 US 948), "While conceptually we have recognized that declarations against penal interest *can be admitted against an accused*—admissions of guilt may in fact be 'among the most disserving of declarations' *(People v Maerling,* 46 NY2d 289, 297)—*inculpa-*

*tory declarations* of witnesses unavailable for cross-examination are subject to even more exacting scrutiny than others". (Emphasis added.)

Thus, in *Thomas (supra), People v Brensic (supra), People v Morgan* (76 NY2d 493) and *People v Geoghegan* (51 NY2d 45), third-party statements were used against the *accused,* which prompted the Judge Kaye writing for the Court of Appeals to use a higher standard of "exacting scrutiny" for their admission. Here, however, we deal with declarations which are exculpatory as to the defendant, and therefore, the standard is more lenient. "Supportive evidence is sufficient if it establishes a *reasonable possibility* that the statement *might* be true" *(People v Settles, supra,* at 169-170 [emphasis added]).

■ The refusal of the trial court to allow the exhibition of Skinner to the jury was also erroneous. Since there *was* sufficient evidence to establish that the declarations made by Skinner might be true, a corporeal display of Skinner so that the jury could compare his appearance with that of defendant was material and relevant to the issue of identification.

Since the errors herein deprived defendant of his right to call witnesses on his behalf, they deprived him of a fair trial, and thus, mandate a reversal, regardless of the quantum of the People's proof. "Few rights are more fundamental than that of an accused to present witnesses in his own defense" *(Chambers v Mississippi, supra,* at 302). In any event, even if harmless error analysis were applicable, we would find that the errors were not harmless beyond a reasonable doubt *(Chapman v California,* 386 US 18, 24).

In view of our reversal and remand for a new trial, we do not find it necessary, at this time, to decide any remaining issues.

Accordingly, the judgment, Supreme Court, New York County (Alvin Schlesinger, J.), rendered November 6, 1991, convicting defendant, after trial by jury, of murder in the second degree and criminal possession of a weapon in the second degree, and sentencing him to concurrent terms of 18 years to life and 2 to 6 years, respectively, should be reversed, on the law and the facts, and the matter remanded for a new trial.

MURPHY, P. J., WALLACH and KUPFERMAN, JJ., concur.

Judgment, Supreme Court, New York County, rendered November 6, 1991, reversed, on the law and the facts, and the matter remanded for a new trial.