*934 OPINION OF THE COURT
James G. Starkey, J.
Defendant has moved pursuant to CPL 440.10 (1) (g) and (h) for an order vacating a judgment, convicting defendant of murder in the second degree and related crimes, entered after a jury trial on May 21, 1990. The convictions were affirmed by the Appellate Division on March 15, 1993 (People v Branch, 191 AD2d 576 [2d Dept 1993]) and by the Court of Appeals on May 12, 1994 (People v Branch, 83 NY2d 663 [1994]).
Defendant urges that a videotaped statement of defendant’s brother in which the brother admits his involvement and exculpates defendant constitutes newly discovered evidence requiring that the judgment be vacated. The prosecution contends that the videotaped statement of defendant’s brother would not be admissible in evidence if a new trial were granted.
A hearing was ordered and testimony was taken on January 15, 16 and 17, 1997 and February 14, 1997 from witnesses who included defendant’s sisters, Belinda Branch and Vinerva Branch; his mother, Ruthel Branch; one Jermaine Gillman; and the attorney who represented defendant during trial.
Findings of Fact
On March 26, 1988, one Danny Josephs was shot to death in an apartment located on the second floor of 230 Lott Avenue, Brooklyn, in a housing complex known as “The Plaza”. Fourteen months after that, two men named Thomas Edwards and Shorn Green implicated defendant Lamont Branch when they were being questioned concerning a different homicide in the same area.
In due course, defendant was indicted for murder and an attorney of substantial experience and good repute was assigned to represent him. Soon after that, various members of defendant’s family including two sisters, Belinda and Vinerva Branch, and his companion, a woman named Brenda, informed trial counsel that the true culprit was defendant’s brother, Lorenzo Branch, and that Lorenzo Branch had admitted it. The two sisters stated that Lorenzo Branch had said as much to them and Vinerva Branch added that she had, at the request of Lorenzo Branch, received from him and concealed a weapon shortly after the fatal shot had been fired. Though it seems that defendant’s mother, Ruthel Branch, never told trial counsel prior to trial that Lorenzo Branch had made similar statements to her, counsel was given to understand that this *935 was the case—either by implication on the part of Ruthel Branch or the representations of other family members, or both. Trial counsel also had two telephone conversations with a person who identified himself as Lorenzo Branch during which—while never admitting culpability in the homicide—Mr. Branch asked what would happen to him if he were to admit involvement. Trial counsel informed him that he would probably be arrested and advised him to turn himself in, but Lorenzo Branch never did so.
Trial counsel then planned to have one or more family members testify to the admissions of Lorenzo Branch, preferably including defendant’s mother, Ruthel Branch, but warned Vinerva Branch that she would face possible arrest herself if she were to admit concealing the weapon from which the fatal shot had been fired. Having filed an alibi notice, he also advised the witnesses against giving statements to the prosecution concerning what had happened before sitting down with him to consider and reconcile any inconsistencies.
As it happened, he was disappointed concerning his desire that statements to the prosecution be deferred. As the trial drew near, he learned that witnesses he had tentatively planned to call had, indeed, given statements to representatives of the District Attorney, statements which were all too often inconsistent with, and contradictory to, each other. Trial counsel concluded that those inconsistencies reduced the number of candidates available to testify to defendant’s alibi, but still expected to make the point. So, in part, he opened to the jury in April 1989 as follows:
“But more important, you will hear alibi witnesses. Lamont Branch went to the aid of Danny Josephs, the Godfather of his child, to help him. And someone came to his apartment and said all hell was broken out at Danny’s. They are all fighting over there. You had better get over there and stop everything before something happens.
“But he didn’t get there in time. And that [was] all that had happened before he had left his house on Lott Avenue.
“You will hear people testify who were at the apartment when a person came to get him. And you will hear members of Lamont Branch’s family tell you that they had spoken to his brother, Lorenzo Branch, who looks almost identical to Lamont. And that he has admitted to them that he committed this crime; that he was the one who was there; that he had the fight with Danny, and that he is not going to come forward and help his brother.
*936 “You will hear this from members of his own family that have had to choose which to help, one brother, the innocent brother; or testify on record under oath against the guilty brother.
“And after that you will have no trouble with a fair verdict. Trust me.”
During the prosecution’s case the pathologist who performed the autopsy testified that the bullet which wounded the deceased entered the front of the head, then proceeded from front to back and only slightly upward. He further stated that—as demonstrated by the absence of “gunpowder or stippling”—the shot had been fired at a distance of more than 18 inches from the head.
The two men—Thomas Edwards and Shorn Green—testified that defendant, in the company of two others, broke into the apartment occupied by the deceased and shot him, which testimony was corroborated in part by photographic evidence showing what appeared to be a broken door and testimony by the first officer on the scene that when he arrived the door appeared to have been broken.
Trial counsel rigorously and ably cross-examined the two men, each of dubious character and daily crack users, who had identified defendant as the culprit. As the trial proceeded, defendant’s companion Brenda (who was not expected to testify) and his two sisters, Belinda and Vinerva, attended each day as extremely interested parties. Each sister also indicated a willingness and eagerness to testify. But as the time for the defense case neared and Vinerva Branch was reminded that she could be prosecuted if she were to admit concealing the weapon from which the fatal shot had been fired, her attitude changed and she declined to testify. Defendant’s mother who, trial counsel had been told, was in a position to assist the defense case, was also reported to be unwilling to testify (notwithstanding a claim by her in an affidavit sworn to on July 20, 1995 that she had informed trial counsel during the trial that Lorenzo Branch had admitted his culpability to her). Thus, by the time the defense case was scheduled to start, it was trial counsel’s understanding that the only witness still available to testify concerning defendant’s alibi and admissions by Lorenzo Branch was defendant’s sister Belinda. And then, when counsel stepped out of the courtroom to call Belinda Branch (who had been waiting outside earlier with a friend) she too had disappeared without notice. The use of compulsory process was considered, but defendant directed *937 trial counsel not to employ the subpoena power. Trial counsel requested defendant’s companion, Brenda, to bend every effort to produce Belinda or Ruthel Branch the next day, but neither showed up and it was made clear to counsel that he could expect no cooperation from them. The defense was unable to call any witnesses and defendant Lament Branch was ultimately convicted on April 27, 1990, after the jury had twice announced itself deadlocked.
At that point a new sense of urgency awoke among defendant’s relatives. His mother—who had resolutely refused to testify for defendant—informed trial counsel on the day of defendant’s sentence, May 21, 1990, that she was now available to testify that Lorenzo Branch (contrary to his statement later that he had told no one) had admitted to her involvement in the shooting. Defendant’s mother also wrote to Legal Aid Attorney Linda Poust on or about August 13, 1991 complaining that trial counsel had failed to call Belinda Branch as a witness. Curiously, she did not then inform Ms. Poust that her son Lorenzo had admitted to her complicity in the shooting. She conveyed that information to Ms. Poust for the first time in a separate letter almost two weeks later on or about August 26, 1991. Still later, as set forth in an affidavit sworn to on July 20, 1995, she told Ms. Poust that during the trial Lorenzo Branch had told her that he had shot the deceased and that she had immediately informed trial counsel who presented no evidence to that effect.
In the spring of 1992, defendant’s sister, Belinda Branch, also contacted Ms. Poust and told her that she had slept in defendant’s apartment the night before the deceased was shot and that defendant’s companion, children and a friend named Jermaine Gillman had also slept there. She stated that defendant had been absent during the night, but arrived in the morning with another friend named Andre Hilbert, followed soon after by the arrival and quick departure of a man named John (“Boops”) Green. After that—contrary to the position later taken by Lorenzo Branch—she stated that Lorenzo arrived, spoke to defendant, and left—followed by defendant and Andre Hilbert. She further claimed that defendant told her later that day that the deceased had been shot and that— again contradicting Lorenzo Branch’s later videotaped statement that he had told no one—Lorenzo “eventually” told her *938 that the deceased had been accidentally shot during a struggle after he had pulled a gun on Lorenzo.*
Lorenzo Branch was importuned to step forward and announce that he, not defendant, had been involved in the death of decedent Danny Josephs. Lorenzo Branch had previously stated that he would do so if defendant were convicted, but then took the position that the appeal process might obtain a new trial without placing him at risk. In the end, he was almost right. While the Appellate Division affirmed the conviction unanimously on March 15, 1993, the Court of Appeals on May 12, 1994 barely affirmed by a 4 to 3 vote.
Shortly after defendant’s conviction was affirmed by the Court of Appeals, defendant’s mother called Legal Aid Attorney Linda Poust and stated that Lorenzo Branch was willing to see her. Then, on July 8, 1994, Lorenzo Branch did come to her office and spoke to Ms. Poust in the presence of his mother and a Legal Aid paralegal. He claimed that he had taken over an empty apartment at 230 Lott Avenue in early 1988 and allowed Danny Josephs to stay there temporarily. He stated that on March 26, 1988 he had tried to enter and the deceased— who was selling crack—would not let him in, resulting in an argument through the closed door. Eventually, he said, the deceased opened the door, pointed a gun at him and a struggle ensued during which the gun went off—fatally wounding the deceased in the head.
Lorenzo Branch declined to swear in an affidavit to what he had said, stating that he wanted to see what the prosecutor’s office would offer him first. He then left, but at Ms. Poust’s request he ultimately returned to her office with his mother on December 14, 1994 and agreed to give his version of what had *939 occurred, on videotape. The statement was a more detailed version of his July 1994 statements and differed from his sisters’ representations in important respects. In the first instance, he made no mention of giving any weapon to his sister Vinerva and stated that the pistol from which the shot had been fired had been left behind when he fled from the apartment. He also sharply differed with his sister Belinda’s representations, stating that he had never gone to defendant Lament Branch’s apartment that day—either before or after the shooting—and did not see defendant at all until later that day or the next day. Further, in explaining why he was coming forward at that point, he stated that he “didn’t really tell anybody about this,” not even his mother or father. He suggested that relatives might have heard things implicating him “on the street,” but that he had never told anyone (contrary to the claims of his mother, his two sisters and Jermaine Gillman).
While Lorenzo Branch was prepared to make a videotaped statement exculpating his brother and to assume a minuscule measure of responsibility for the death of the deceased (which measure included a legal defense), consistent with his prior declination to sign an affidavit, he was apparently not willing to make his video statement under oath and none was administered. Nor was he prepared to make such a statement under oath and subject himself to cross-examination at the hearing. Though he appeared at the request of counsel for defendant on two different days, he invoked his privilege against self-incrimination on each occasion and declined to testify.
His mother, his two sisters and Jermaine Gillman testified but, as noted above, each was contradicted in at least one important respect by Lorenzo Branch. In addition, Belinda Branch conceded the existence of two or three criminal convictions involving stolen cars and at least one narcotic conviction. Finally, her testimony that defendant had told her that Lorenzo Branch had shot the deceased was also contradicted by her own sworn statement in an affidavit dated July 20, 1995.
Conclusions of Law
When a defendant contends that newly discovered evidence requires that a conviction be vacated, it is well settled that the evidence relied upon (a) must be such as will probably change the result if a new trial is granted; (b) must have been discovered since the trial; (c) must be such as could not have been discovered before the trial with the exercise of due diligence; (d) must be material to the issue; (e) must not be *940 cumulative to the former issue, and (f) must not merely impeach or contradict the former evidence. (See, People v Salemi, 309 NY 208, 216 [1955]; see also, CPL 440.10 [1] [g].)
The central issue presented here relates to the prosecution’s contention that the statement relied upon would not—since it is hearsay—be admissible if a new trial were granted. If it would not, of course, it fails the first test of evidence relied upon as newly discovered in applications for a new trial: that the evidence must be such as will probably change the result if a new trial is granted. (See, People v Salemi, supra, at 215-216 [1955].)
The defendant urges that the evidence qualifies as an exception to the rule excluding hearsay testimony and would be admissible as a statement against Lorenzo Branch’s penal interest. (See, People v Settles, 46 NY2d 154 [1978].) As to that contention, four prerequisites must be met before a statement may be received as one against the declarant’s penal interest. In the first instance, “the declarant must be unavailable [to testify by reason of death, absence from the jurisdiction or refusal to testify on constitutional grounds]; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and, fourth, and most important, supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability”. (People v Settles, supra, at 167.)
As to the first requirement, defendant is on solid ground since his brother has invoked his privilege against self-incrimination, making him unavailable to testify. (See, People v Fields, 66 NY2d 876 [1985].) And, taken at its terms, if the statement be considered trustworthy and reliable, it reveals competent knowledge of the facts underlying the statement.
The difficulty with the statement’s admissibility lies in the requirements that the declarant be aware that the statement is adverse to his penal interest and that supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability. Defendant contends that the testimony of his sisters, his mother and Jermaine Gillman provides the necessary supporting circumstances independent of the statement to attest to its trustworthiness and reliability. Specifically, defendant refers to testimony that Lorenzo Branch was seen by his sister Vinerva in the vicinity of the homicide in possession of a gun and had, *941 more than once, admitted his culpability. But that argument is seriously undermined by the untrustworthiness and unreliability of those relatives and Jermaine Gillman. As noted above, the claims of the sisters, mother and Jermaine Gillman are rife with contradictions and, quite importantly, were contradicted in significant respects by Lorenzo Branch himself.
The statement of Lorenzo Branch was also at variance, in noteworthy ways, with uncontradicted evidence received during the trial. In the first instance, his claim that the deceased voluntarily opened the door to the apartment was inconsistent with the photographic evidence showing what appeared to be a broken door and the testimony of the first officer on the scene that when he arrived the door appeared to have been broken— evidence, as noted above, consistent with testimony of prosecution witnesses that the door had been forced open by the culprits.
Secondarily, his statement is difficult to reconcile with the testimony of the pathologist who performed the autopsy. A shot fired more than 18 inches from the head, on a course almost straight from front to back, seems quite inconsistent with the claim of Lorenzo Branch that the deceased had been shot accidentally during a hand-to-hand struggle.
As to the requirement that the declarant be aware that the statement is adverse to his penal interest, implicit in that requirement is that the statement be in fact adverse to his penal interest, and clearly so. (See, People v Ferguson, 154 AD2d 706, 707 [2d Dept 1989].) And here too, the defendant’s position is flawed. If the facts make anything clear in this case, it is the intent of Lorenzo Branch to help his brother as much as possible while simultaneously insulating himself against criminal prosecution and conviction. After finally agreeing to speak, he declined to testify under oath, then gave a largely exculpatory statement and resolutely refused to do so in person to law enforcement officers, or otherwise make himself available to face any penal consequences (indeed, even his sister Belinda testified that she did not know where he lived and, while she could contact him if need be, she could only do so through a pager number).
Since the statement is largely exculpatory in nature, it is not clearly opposed to Lorenzo Branch’s penal interest. (See, People v Ferguson, supra, at 707 [2d Dept 1989]; People v Crimi, 137 AD2d 702 [2d Dept 1988].) Secondarily, and of equal importance, the over-all circumstances contrived by Lorenzo Branch demonstrate that his statement “held no reasonably certain or *942 imminent threat of prosecution or conviction”. (People v Morgan, 76 NY2d 493, 495 [1990].)
All of which is not to say that the story of Lorenzo Branch and the other witnesses are totally devoid of substance. The facts as described create a gnawing sense that, one way or another, Lorenzo Branch may well have been one of those involved in the death of Mr. Josephs and the possibility that defendant is innocent cannot be excluded beyond cavil. It is further true that the standard for admissibility of statements against penal interest is not as rigorous when the evidence is offered by the defense and not the prosecution. (See, People v Thomas, 68 NY2d 194, 198 [1986]; People v Smith, 195 AD2d 112, 125 [1st Dept 1994].)
But the effort to have it both ways—a new trial for defendant by means of an unsworn, self-serving, hearsay statement which insulates Lorenzo Branch from significant risk—must fail. Manipulative conduct of the kind presented in this case should not and will not be rewarded for the reasons stated above and the strong policy interests on which they are based.
In light of the foregoing, the defendant’s motion to vacate his conviction is hereby denied in all respects.

 In July 1994 Ms. Poust also contacted Jermaine Gillman who stated that he slept at defendant’s apartment the night before the homicide, as did defendant’s companion Brenda, their children and his sister Belinda. Contrary to Belinda Branch’s statements, he also asserted that defendant slept there that night and only left the apartment when John “Boops” Green came the next morning with the news that decedent had been shot. Jermaine Gill-man—unlike Belinda Branch—did not assert that Lorenzo Branch had come to the apartment that morning. Like Belinda Branch, however, he contradicted Lorenzo Branch by stating that Lorenzo had—several times— implicated himself and exculpated defendant in the shooting of decedent. In September 1994, Vinerva Branch also told Ms. Poust that Lorenzo had implicated himself to her shortly after the shooting.
Efforts to interview John Green, Shorn Green and Thomas Edwards were unsuccessful and Brenda, after also claiming to Ms. Poust that Lorenzo Branch had told her he had killed decedent, apparently became estranged from defendant and disappeared.