OPINION OF THE COURT
Bernard Fried, J.
Defendant Charles Okafor was tried for murder in the second degree and related charges arising out of the shooting death of his wife Patience Okafor. Following the People’s direct case and after defendant himself testified, the People offered as part of their rebuttal case certain former testimony given by the deceased at a prior Family Court hearing. The People had sought to introduce this testimony, in which the deceased related threats to kill her made by her husband, in order to rebut his trial testimony that he lacked the intent to kill her.
The question before me at trial was whether this former testimony was admissible on the People’s rebuttal case. For the reasons that I presently explain, I held in the affirmative.[1]
On the People’s direct case it was established that the *537 defendant shot and killed his estranged wife on August 9, 1983, in her apartment located at 2345 Walton Avenue in The Bronx. Briefly stated, the defendant immigrated to the United States from Nigeria. Thereafter, he brought his son, by his first marriage, Chris Okafor, to New York in 1981. Chris, who was 23 years old at the time of the trial, testified that he had initially moved in with the defendant, his second wife, the deceased Patience Okafor, and their two young children. According to Chris, there were marital disputes between the defendant and Patience; that in the summer of 1982, he observed the defendant strike Patience; and that in September 1982 he (Chris) moved out of his father’s apartment. Shortly thereafter, Patience and her two children also moved away and after staying at Chris’s new apartment ultimately moved in December 1982, into the apartment on Walton Avenue where she was killed.
In the afternoon of August 9, 1983, as a result of a radio run, uniformed police officers responded to Patience’s apartment. Later that day, responding to yet another radio run, the officers returned at about 11:30 p.m. When they knocked on the door, a woman answered that no one was home. As they knocked again shots were heard and the police entered the apartment. Inside they found two children crying, one of whom, "Mitchey” Okafor, age five, said "daddy hurt mommy.” The police also observed the body of Patience near the apartment door. It appeared that the defendant had fled the apartment on the fire escape.
A short while later, police officers went to defendant’s apartment house, located on West 143rd Street in Manhattan, where they waited outside his apartment. When a man, who turned out to be the defendant, was seen putting a key in the door he was told "Police, stop.” The defendant, however, ran down the hallway and drew a gun. He was ultimately apprehended and a spent round, recovered inside Patience’s apartment, was determined to have been fired from the gun seized from defendant.
Based on this evidence, and other not here summarized, defendant’s motion for a trial order of dismissal (CPL 290.10) was denied, and he testified in his own behalf. He admitted having been in Patience’s apartment on the evening of August 9, 1983, and that he had fired his gun. However, he denied that he shot at Patience or that he intended to hurt or kill her. He recounted that he had immigrated to the United States in 1969, leaving his first wife and son, Chris, in Nigeria. *538 In 1974 during a return visit to Nigeria, he became betrothed to Patience, who joined him in New York in 1977, where they had two children, including "Mitchey.” Then, in October 1981, his son Chris came to live with defendant and Patience.
Defendant traveled in 1982 to Nigeria for a visit and he testified that after he returned to New York in June 1982, he discovered that something had changed in what he characterized as his previously perfect marriage to Patience. Ultimately, he came to believe that Patience and Chris had developed a sexual liaison with each other, and in September he ordered Chris to leave home. The following week Patience moved out and he learned that she was living in the apartment on Walton Avenue. By February 1983, Patience was under a Family Court order of protection which permitted twice weekly visits by defendant with his two children. Thereafter, defendant, who believed that the suspected sexual relationship between Chris and his wife was continuing, employed a person to follow them. Also, defendant continually telephoned Patience inquiring about her relationship with Chris. On June 10, 1983, at "Mitchey’s” graduation, defendant saw his wife and believed her to be pregnant. When confronted by him, Patience said that she was not pregnant.
Things continued the same, until the morning of August 9, 1983, when the defendant was told by a neighborhood woman that Patience had had an abortion. After hearing this, defendant went to Patience’s apartment, was admitted by his son "Mitchey”, and searched the apartment. He found certain papers which seemed to confirm that Patience had recently had an abortion. The defendant, who was carrying a loaded revolver which he had purchased in January 1979, then went to Chris’s apartment and spoke to Chris, who denied any knowledge that Patience had had an abortion. The defendant returned to Patience’s apartment at about 9:00 p.m., planning to commit suicide in her presence. She was not at home and the defendant waited until she returned; ultimately, he was admitted into the apartment by her. He testified he was still planning to kill himself in her presence.
According to defendant, once inside the apartment while he had his gun out, Patience admitted having had a sexual relationship with Chris, leading to an abortion. She agreed to write a statement in exchange for his promise to forgive her, and she went to another room for a piece of paper. When she returned to the kitchen, there was a knock on the apartment door. She said "no one is here” and then defendant heard that *539 it was the "police”. At this time the defendant tried to get Patience to leave with him, when she ran to the door. Defendant fired his gun toward the people coming in the door, claiming that a shot was fired at him. He then fled down the fire escape and was later arrested at West 143rd Street after his confrontation with the men who turned out to be police officers.
Defendant insisted that he did not intend to kill his wife, nor injure her. He denied having threatened or beaten his wife in the past, and specifically denied that he had threatened to kill her on March 12, 1983.
Following the completion of the defense case, the People sought, as part of their rebuttal, to introduce the April 15, 1983 sworn Family Court testimony of Patience Okafor,[2] given in the presence of defendant and his attorney, and subject to cross-examination, although none was conducted. The testimony of Patience Okafor was that on March 12, when her husband returned her two children to her, "he threatened to kill me if I don’t return to Nigeria with the children”, specifically stating, "[e]ither I return back to him by that week-end. He will kill me. He don’t care whether I have President Reagan by my side, the Court by my side or any policeman by my side or if I am by my boss Mrs. Anderson or in the clinic. He don’t care he will kill me and whoever is backing me up.” And that defendant beat her "[w]hen I was still with him. Every week-end I must get beatings. He wrestled me on the bed, whatever, I got it for five and a half years.”
The relevance of this testimony to the issue of defendant’s culpable mental state cannot be disputed. Prior threats, if otherwise without legal impediment, have historically been admissible as circumstantial evidence of whether the consequent crime was intended. (See, e.g., People v Paige, 283 NY 479; People v O’Sullivan, 104 NY 481.) Thus, the only question is whether the prior threats are admissible rebuttal evidence in a murder trial, when evidenced by former Family Court testimony of the decedent.
Citing People v Harding (37 NY2d 130 [1975]), the defendant contends that the only former testimony that may be received in a criminal trial is that specified in CPL article 670, which does not include Family Court proceedings. The People on the *540 other hand, citing decisions such as Matter of Holtzman v Hellenbrand (92 AD2d 405 [2d Dept 1983]), respond that the misconduct of the defendant constitutes a waiver of objection to the admission of this evidence under traditional common-law rules governing the use of former testimony, at least when offered for rebuttal purposes. The argument is that People v Harding does not hold otherwise in a situation, such as this, where the defendant is responsible for the unavailability of the witness.
At common law, former testimony was admissible as an exception to the hearsay rule, pending satisfaction of certain prerequisites.[3] As a threshold matter the former testimony must have been given under oath, there must have been an opportunity for cross-examination, and it is usually required that there be identity of parties and substantial similarity of subject matter. Then in order to be received at the subsequent proceeding, the declarant must be presently unavailable due to death, illness, or absence from the jurisdiction. (See, e.g., Richardson, Evidence § 277 [Prince 10th ed]; Fisch, New York Evidence §931, nn; McCormick, Evidence § 254, nn [2d ed 1972]; 4 Weinstein, Evidence ch 804.) The theory is that such former testimony, sworn and given when there was a fair opportunity for cross-examination, is sufficiently reliable to be received into evidence when the declarant is unavailable. Moreover, it has been held to be constitutionally unoffensive to receive such prior testimony as evidence in a criminal trial. (E.g., Mattox v United States, 156 US 237 [1895]; People v Arroyo, 54 NY2d 567 [1982].) As noted by Professor McCormick, "while the rather general practice is to speak loosely of unavailability of the witness the critical factor is actually the unavailability of the testimony” (op. cit., §253, at 608; see also, 4 Weinstein, op. cit., at 804-35).
Patience Okafor’s testimony meets all of the classic common-law requirements for the admissibility of former testimony: her Family Court testimony was received under oath and defendant had a fair opportunity for cross-examination even though he did not exercise it.[4] She is unavailable due to *541 death. The parties are essentially the same, although the District Attorney did not appear at the Family Court hearing. And finally, the subject matter in Family Court concerned assaultive and threatening behavior by the defendant, while the criminal trial concerned the ultimate accomplishment of the conduct alleged in the Family Court.
Turning now to the question whether CPL article 670 precludes use of this former testimony: by its literal terms CPL 670.10 (1) permits the receipt into evidence, at a criminal trial, former testimony when given at: "(a) a trial of an accusatory instrument, or (b) a hearing upon a felony complaint * * * or (c) an examination of such witness conditionally”. And, of course, the subsequent proceeding must "constitute] part of a criminal action based upon the * * * charges which were pending against the defendant at the time of the witness’s testimony and to which such testimony related”. (CPL 670.10 [2] [a].)
It is this statute that was considered in People v Harding (supra), and held to bar the former testimony of a witness given at an earlier police department disciplinary hearing, where the witness had since died by the time of the criminal trial. The Court of Appeals rejected the argument that the statute was not exclusive and pointed out that Fluery v Edwards (14 NY2d 334 [1964]), which broadly construed a somewhat similar, yet different, civil statute (CPLR 4517), was not applicable to the criminal statute.[5]
Notably, in Harding, which involved the prosecution of a police lieutenant for bribe receiving and related charges, there was no suggestion that the defendant had any connection with the death of the witness, who had earlier testified at the administrative hearing. In this case, however, having heard both the People’s direct case and the defense case, I have no doubt, tested either by the standard of clear and convincing evidence, or an even higher standard of proof, that the defendant shot and killed his wife.[6]
*542 It is evident that Family Court testimony is not within the ambit of article 670 and that Harding does not authorize the use of former testimony taken other than in the particularly designated proceedings. However, this does not end the matter since Harding did not treat the peculiar circumstances where the defendant by his own misconduct is responsible for the unavailability of the witness. In such case there is precedent in this State, to permit the reception of former testimony, although not specified in section 670.10. (See, Matter of Holtzman v Hellenbrand, supra.) The theory justifying admission is that by such conduct the defendant has waived his right to object to the admission of the evidence, either as violative of section 670.10 or his constitutional right of confrontation. While Matter of Holtzman v Hellenbrand, and its progeny, e.g., People v Colon (122 Misc 2d 1084 [Sup Ct, Kings County 1984]) and People v Sweeper (122 Misc 2d 386 [Sup Ct, NY County 1984]), concerned the use of Grand Jury testimony, logically there is no reason why the Hellenbrand waiver rule should not apply to other former testimony. Indeed, when measured by the former testimony, given in the presence of the defendant, with an opportunity to cross-examine, seems at least as reliable, if not even more reliable, than Grand Jury testimony. Moreover, the background of the Family Court proceeding on April 15, 1983, which while not disclosed to the trial jury, shows that there was a larger history in that court involving earlier findings that the defendant had been in violation of orders of protection. This history of judicial proceedings, coupled with the trial testimony of his son, Chris, clothes the former testimony with a high degree of trustworthiness to justify its reception. (Cf. United States v Mastrangelo, 693 F2d 269; Fed Rules of Evidence § 804 [b] [2] [in 28 USC, Appendix]; United States v Papadakis, 572 F Supp 1518 [US Dist Ct, SDNY 1983].)
Harding, then, is not dispositive. A defendant by his own misconduct can be deemed to waive his constitutional right of confrontation or his right to object to evidence otherwise normally barred by CPL 670.10, even though admissible under common-law principles. That this was a murder prosecution, where it is the alleged misconduct of the defendant that forms the gravamen of the case does not prevent application of the *543 Hellenbrand-Mastrangelo waiver rule. To the contrary, to preclude its use, under the circumstances, here limited to rebuttal evidence, would create the irony that the defendant, having successfully carried out the very crime he threatened to commit and which gave rise to the Family Court proceedings, would by its commission insure that such threats not come to light at trial. Exclusion of his former testimony would subvert the interests of justice.
Accordingly, the former testimony was properly admitted on the People’s rebuttal case.

. This memorandum is written to explain the basis for my trial ruling.

. While the jury was not so advised, it should be noted that this Family Court proceeding concerned an alleged violation of an order of protection issued on November 9,1982.

. Compare, 5 Wigmore, Evidence § 1370 (Chadbourn rev 1974), which argues that since such testimony is not hearsay, assuming relevance and competency, it should be admissible.

. Indeed, defendant had every incentive to cross-examine, considering that he faced potential jail for a violation of an order of protection (Family Ct Act § 846 [b]). His failure to do so does not militate against the reliability of the evidence. (People v Arroyo, 54 NY2d 567, 574.)

. It is worthy of note that Proposed Code of Evidence § 804 (b) (2) would permit the reception into evidence in criminal cases, all types of former testimony, so long as the defendant was a party to the prior proceeding, the testimony was taken under oath, and there was an opportunity to cross-examine (Proposed Code of Evidence, § 804 [b] [2], Comment, at 213-214, 243).

. Having reached this conclusion, I deem it unnecessary to pause to consider the question of the appropriate standard of proof necessary to establish that the defendant is responsible for the witness’s unavailability. *542 (Cf. Matter of Holtzman v Hellenbrand, 92 AD2d 405, 413-415 ["clear and convincing”], with United States v Mastrangelo, 693 F2d 269, 273-274 [2d Cir 1982] ["preponderance of evidence”].)